IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JACOB B.,                               )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )          1:22CV678
                                        )
LELAND DUDEK,                           )
Acting Commissioner of Social Security, )
                                        )
                    Defendant.          )

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Jacob B. ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the

Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review

of a final decision of the Commissioner of Social Security denying his claims for Supplemental

Security Income and Child Supplemental Security Income under Title XVI of the Act.  The

parties have filed cross-motions for judgment, and the administrative record has been certified

to the Court for review.

I.        PROCEDURAL HISTORY

Plaintiff filed his application for Supplemental Security Income on May 14, 2019,

alleging a disability onset date of January 1, 2004.  (Tr. at 33.)[1]  His application was denied

initially (Tr. at 120-36), and that decision was upheld upon reconsideration (Tr. at 137-52).

Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #10].

Law Judge ("ALJ"). (Tr. at 167-70.) On November 9, 2020, Plaintiff, represented by an attorney, appeared at the subsequent hearing, at which Plaintiff and his mother both testified. (Tr. at 33, 58-90.) Several weeks after the hearing, on December 2, 2020, the ALJ requested written interrogatories from an impartial medical expert, which were later entered as additional exhibits in the administrative record. (Tr. at 33, 492-512.) The ALJ also held a supplemental telephone hearing on October 7, 2021, at which Plaintiff and his attorney again appeared, and at which an impartial vocational expert appeared and testified. (Tr. at 33, 91-119.)

On November 12, 2021, the ALJ issued a decision concluding that Plaintiff was not disabled within the meaning of the Act (Tr. at 53), and on June 13, 2022, the Appeals Council denied review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 21-26). Plaintiff filed the action now before the Court on August 18, 2022, one day after the deadline for filing a civil action expired, and Plaintiff's counsel requested that the Appeals Council grant an extension of time, which the Council later granted. (Tr. at 1.) Therefore, the civil action was deemed timely filed.

II.    LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the

correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris,

3

658 F.2d 260, 264 (4th Cir. 1981). For claimants ages 18 and older,[2] "[t]he Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional

---

[2] Plaintiff's disability applications, as filed with the Social Security Administration, involve periods of time both before and after Plaintiff attained the age of 18. Therefore, the ALJ evaluated Plaintiff's claims using two different standards in accordance with the regulations. However, in the case now before the Court, Plaintiff only challenges the ALJ's treatment of his adult disability claim. Specifically, as discussed below, Plaintiff only challenges the ALJ's "failing to explain why the effects of [Plaintiff's] episodes of low blood glucose would not cause him to be away from the work station or to need [] additional work breaks." (Pl. Br. at 15.) The Court therefore considers here only the relevant standards for adult disability determinations.

capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.    DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his May 14, 2019 application date. (Tr. at 38.) He therefore met the first step of the sequential evaluation process. The ALJ next determined at step two that Plaintiff suffered from the following severe impairments prior to age 18:

> Diabetes mellitus; visual disturbance; speech and language disturbance; and
> learning disability

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

5

(Tr. at 39), and had "not developed any new impairment or impairments since attaining age 18" (Tr. at 48).[4]  At step three, the ALJ determined that none of these impairments, singly or in combination, met or medically equaled a listed impairment.  (Tr. at 48-50.)  Therefore, the ALJ assessed Plaintiff's RFC and determined that he could perform sedentary work with the following, additional limitations:

> [He can] perform sedentary work as defined in 20 CFR 416.967(a) and can lift and carry up to 10 pounds.  He can also sit for up to six hours as well as stand and walk for up to two hours.  On a frequent basis, he can reach, handle, finger, and feel bilaterally.  Further, he can occasionally balance, stoop, kneel, crouch, and use ramps and stairs.  However, he can have no exposure to common workplace hazards—including unprotected heights, dangerous machinery, ladders, ropes, or scaffolds.  Additionally, he can have no exposure to extreme heat or cold.  He is further limited by monocular vision—that is he has the complete loss of functional vision in one eye but continues to have full functional vision in the other eye at 20/20 visual acuity.

(Tr. at 50.)[5]  The ALJ found at step four of the analysis that Plaintiff had no past relevant work.  (Tr. at 51.)  However, the ALJ determined at step five that, given Plaintiff's age, education, RFC, and the testimony of the vocational expert as to these factors, he could

---

[4] As noted above, Plaintiff's disability applications involved periods of time both before and after Plaintiff attained the age of 18.  The ALJ concluded that Plaintiff failed to establish disability prior to age 18 because he "did not have an impairment or combination of impairments that met or equaled a listing" for child disability under 20 CFR § 416.924.  (Tr. at 48.)  Plaintiff does not challenge that determination in this case.  The ALJ also evaluated Plaintiff's impairments under the applicable regulations for adult disabilities, since the application included claims for the period after Plaintiff turned 18, and that is the determination Plaintiff challenges in the present case, as set forth above.

[5] The ALJ concluded that Plaintiff did not have any medically determinable mental health impairment, and Plaintiff does not challenge that determination in this case.  (Tr. at 49.)  Plaintiff was designated with a learning disability in early elementary school, but was re-evaluated in 2016 and was determined to have low average to average intellectual functioning and academic achievement, with no need for special services.  The ALJ noted that Plaintiff obtained a driver's license and GED, and at the hearing, Plaintiff's representative asserted that Plaintiff did not have a severe medically determinable mental impairment.  (Tr. at 39, 44, 46, 47, 49.)  The ALJ nevertheless considered this history and also considered the impact of Plaintiff's diabetes-related symptoms on his ability to concentrate, persist, maintain pace, interact with others, or adapt.  (Tr. at 49.)

6

perform other jobs available in significant numbers in the national economy. (Tr. at 51-52.) Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 53.)

Plaintiff now brings a single claim, arguing that the ALJ "fail[ed] to explain why the effects of [Plaintiff's] episodes of low blood glucose would not cause him to be away from the work station or . . . need additional work breaks." (Pl.'s Br. [Doc. #15] at 3.) In making this challenge, Plaintiff contends that the ALJ failed to comply with the "narrative discussion requirements" set out in Social Security Ruling 96-8p. (Pl.'s Br. at 6.) See Social Security Ruling 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184 (1996) ("SSR 96-8p"). First, in terms of symptoms, SSR 96-8p requires that "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with medical and other evidence." SSR 96-8p, 1996 WL 374184, at *7. Second, the Ruling more generally requires that, when assessing a claimant's RFC, an ALJ "must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

In the present case, the ALJ specifically found that the record does not support a finding that "the severity of [Plaintiff's] diabetes would result [in] the need for additional breaks, beyond normal breaks, [or] time off task or away from the work station." (Tr. at 51.)[6] Plaintiff argues that this finding conflicts with the ALJ's earlier determination that Plaintiff's

---

[6] The vocational expert at Plaintiff's supplemental hearing testified that the types of occupations identified at step five of the sequential analysis typically involve three breaks per workday, including morning and afternoon breaks "that would consist of ten to 15 minutes in duration, and a lunch break that would typically have a duration of 30 minutes to an hour." (Tr. at 116.) Plaintiff contends that episodes of low blood sugar would require unscheduled breaks in addition to these three breaks.

"reported symptoms during periods of uncontrolled blood sugars 'could reasonably impact his ability to concentrate, persist, maintain pace, interact with others, or adapt during active symptoms.'" (Pl.'s Br. at 5-6) (quoting Tr. at 49). In pertinent part, Plaintiff "reported symptoms of fatigue and feeling 'shaky'" when his blood sugar dropped, and testified that periods of low blood sugar happen "at least two to three times a day." (Tr. at 42, 49, 73.) Plaintiff further testified that, during these episodes of low blood sugar (hypoglycemia), it takes "20 to 40 minutes" for his blood glucose to go back up, and that he sits and waits during this time for his energy to return, unable to "really do much" else. (Tr. at 42, 67, 72-75, 109.)

The ALJ's analysis of Plaintiff's subjective symptoms forms the crux of Plaintiff's challenge. Under the applicable guidance, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p: Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *10 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 416.929. In Arakas v. Comm'r of Soc. Sec., 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20

8

C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

983 F.3d at 95. Thus, the second part of the test requires the ALJ to consider all available evidence, including Plaintiff's statements about his pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work."

Craig, 76 F.3d at 595. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit his ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," id., as well as the following factors set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529(c)(3):

> (i) [Plaintiff's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [Plaintiff's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [his] pain or other symptoms;
>
> (v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [his] pain or other symptoms;
>
> (vi) Any measures [Plaintiff] use[s] or [has] used to relieve [his] pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

9

Here, the ALJ found that Plaintiff's reported symptoms, including periods of fatigue and shakiness due to poorly controlled blood glucose levels, "could reasonably impact" his ability to work. (Tr. at 49.) However, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 46, 51.) The ALJ specifically noted that Plaintiff had reported symptoms of fatigue and being "shaky" when his blood pressure was uncontrolled, "which could reasonably impact his ability to concentrate, persist, maintain pace, interact with others, or adapt during active symptoms", but the ALJ also specifically found that these symptoms resulted in only "mild limitation in understanding, remembering, and applying information; with regard to concentration, persistence, or maintaining pace; and adapting or managing oneself." (Tr. at 49.) As support for this determination, the ALJ noted that, despite Plaintiff's variable blood glucose control, "in his activities of daily living, [Plaintiff] retained the ability to drive independently, receive and forward glucose readings to his mother from his personal cellphone, and intermittently exercised [sic] and cut the grass." (Tr. at 49; see also Tr. at 46.) The ALJ further noted that the "evidence does not document any hospitalizations or treatment for higher level care prior to the age of eighteen," and that after he turned 18, in the year preceding Plaintiff's October 2021 hearing, Plaintiff testified that his blood sugars sometimes went low but he "had not had any emergency room visits, urgent care, or hospitalizations for issues related to his diabetes," nor had he made "any major changes to his diet or lifestyle." (Tr. at 46, 49.) He "maintained positive relationships with family and peers," "successfully completed his general equivalency diploma", and "continued to drive" and play video games and watch television. (Tr. at 49.)

10

Similarly, in his earlier discussion, the ALJ specifically noted that Plaintiff testified that "he had also experienced difficulty with concentration when his blood sugar level was low" but he was still able to "successfully complete his general equivalency diploma." (Tr. at 42.) The ALJ also noted that according to Plaintiff's mother, many of the issues with low blood sugar arose in hot environments, or when Plaintiff was active in the sun. (Tr. at 43.)

Plaintiff nevertheless contends that his testimony regarding the need for irregular and/or extended breaks "is consistent with his reports to his treating physician in October 2019, January 2020, September 2020, and January 2021 that he experienced episodes of hypoglycemia." (Pl.'s Br. at 5) (citing Tr. at 477, 484, 523, 517). However, the ALJ considered Plaintiff's treatment records at length. The ALJ began with a June 2018 treatment record that noted Plaintiff's diabetes was under "poor control" based on an elevated A1c level, but Plaintiff nevertheless "reported normal energy and denied persistent hypoglycemia [low blood sugar] or exercise intolerance" and Plaintiff was "very active." (Tr. at 39, 415-16.) That medical record notes that Plaintiff reported only "0-1 episodes of low blood sugars a week", with no episodes of "severe hypoglycemia requiring intervention with glucagon." (Tr. at 415.) The ALJ noted the next visit in September 2018, with patterns of high blood sugar in the late evenings and overnight. (Tr. at 40, 422.) That record similarly reflects only a "few episodes of low blood sugars a week," and that Plaintiff "denies persistent hypoglycemia" and had not had any "severe hypoglycemia requiring intervention with glucagon." (Tr. at 422-23.) Plaintiff was "physically active outdoors and working with his father." (Tr. at 423.)

The ALJ acknowledged subsequent records in January 2019 and April 2019, still with elevated A1c levels, but the ALJ noted that Plaintiff "denied any instances of hypoglycemia."

11

(Tr. at 40.) Those records reflect that in January 2019, Plaintiff "denie[d] any episodes of hypoglycemia" (Tr. at 429), and in April 2019, Plaintiff "denie[d] any episodes of hypoglycemia" and his data from his glucose monitoring device showed "fair control . . . without hypoglycemia risk" (Tr. at 438). The ALJ further noted the next visit in July 2019, during which Plaintiff reported he had been doing "fairly well", reported that he had been "helping his dad working outside," and denied any severe hypoglycemia requiring intervention with glucagon. (Tr. at 40, 454.) That record similarly reflects that Plaintiff "denie[d] any episodes of hypoglycemia" and the data from his monitoring device again showed "fair control . . . without hypoglycemia risk." (Tr. at 454.) The ALJ also noted that during the next visit in October 2019, Plaintiff reported "'frequent' episodes of hypoglycemia" but no episodes of severe hypoglycemia requiring intervention with glucagon. (Tr. at 41, 477.) That record also reflects that the data from his monitoring devices showed "fair control . . . without hypoglycemia risk", and the provider directed Plaintiff and his parents not to use the insulin pump so often and to use the suggested boluses. (Tr. at 41, 476, 479.)[7]

The ALJ further described the next visit in January 2020 and noted that while Plaintiff reported "significant lows" when entering data in the pump, "review of his glucose monitor revealed fair control with . . . minimal hypoglycemia risk." (Tr. at 41, 483.) Plaintiff reported "several episodes of hypoglycemia" over the past 3 months, but there were no incidents of severe hypoglycemia requiring intervention with glucagon. (Tr. at 483, 484.) The pump was

---

[7] These records and the records from the prior six months note concern that Plaintiff was "frequently stacking insulin" (Tr. at 440), and that "[h]is parents endorse numerous bolus modifications due to his current settings resulting in 'lows,' however this is often when he is not actually <70 mg/dl. We discussed the likelihood that he is prematurely correcting for potential lows, and thus keeping his glucose more elevated than necessary" (Tr. at 457).

adjusted and Plaintiff was again cautioned against dose modifications and multiple doses. (Tr. at 41, 486.) During the remainder of 2020 and into 2021, Plaintiff continued management of his diabetes. (Tr. at 42.) Medical records are similar, with a visit in September 2020 reflecting no episodes of severe hypoglycemia requiring intervention with glucagon, data from his monitoring device showing "fair control . . . with minimal hypoglycemia risk," and a report of only "occasional episodes of hypoglycemia" over the past nine months. (Tr. at 522-23.) The ALJ noted that at the next visit in January 2021, Plaintiff reported that he worked with his father at a lumber yard several days per week, and his pump had been adjusted to avoid related lows, with good results. (Tr. at 42, 517.) That treatment record similarly reflects no instances of severe hypoglycemia requiring intervention with glucagon, with only occasional episodes of hypoglycemia since the last visit. (Tr. at 517.) Thus, contrary to Plaintiff's present assertions, the medical record, reviewed at length by the ALJ, does not support his claim of multiple instances of hypoglycemia per day, and instead reflects only occasional instances of hypoglycemia over a period of months, even while Plaintiff was working, exercising, and doing yard work, and no instances of severe hypoglycemia, and only minimal risk of hypoglycemia based on the data from his monitoring device.

The ALJ also relied on the opinion evidence from Dr. Meyers, the medical expert selected by the ALJ to provide further information regarding the impact of Plaintiff's impairments on his functioning. Dr. Meyers stated in his responses to the medical interrogatories that "the onset of [Plaintiff's] diabetes was at a very young age," and that "[i]t is well known that in these cases, the diabetes is 'brittle' and more difficult to control." (Tr. at 512.) However, neither Dr. Meyers nor any other medical practitioner further opined that

Plaintiff required additional breaks or time off task to account for diabetes complications. Dr. Meyers specifically found no limitation in Plaintiff's ability to acquire and use information, no limitation in his ability to attend and complete tasks, no limitation in interacting and relating with others, and no limitation in caring for himself. (Tr. at 48, 510-11.)

In assessing the RFC, the ALJ acknowledged that objective treatment records indicated variable control of Plaintiff's diabetes with periods of "poor" management despite the use of an insulin pump and glucose monitoring. (Tr. at 51.) He therefore found Plaintiff limited to sedentary work, standing and walking no more than 2 hours per day, with further manipulative, postural, and environmental limitations, including no exposure to extreme heat and no exposure to workplace hazards. (Tr. at 50, 51.) The ALJ also determined that the severity of Plaintiff's diabetes did not result in the need for additional breaks beyond normal breaks, time-off task or away from the work station, or absenteeism. (Tr. at 51.) In assessing the impairments, the ALJ relied on the record, which he discussed at length as noted above regarding Plaintiff's reports to his doctors, the data from Plaintiff's glucose monitoring device, and the assessment of the doctors, and the ALJ also specifically pointed to the lack of any hospitalization or urgent care or emergency visits, the lack of any changes to Plaintiff's diet or lifestyle, the opinion of Dr. Meyers, and Plaintiff's activities of daily living. (Tr. at 49-50.) The Court finds that, by discussing and relying on all the above evidence, the ALJ provided "a logical explanation of how [he] weighed the record evidence and arrived at [his] RFC findings." Thomas v. Berryhill, 916 F.3d 307, 311 (4th Cir. 2019). In doing so, the ALJ met the "narrative discussion requirements" set out in SSR 96-8p by explaining how the evidence was resolved,

14

and finding that Plaintiff's symptoms, including the symptoms related to hypoglycemia, were not as frequent, intense, persistent, or limiting as Plaintiff alleged.

To the extent that Plaintiff essentially asks the Court to reconsider that conclusion and re-weigh the evidence presented, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). Thus, the issue before the Court is not whether a different fact-finder could have drawn a different conclusion, or even "whether [Plaintiff] is disabled," but rather, "whether the ALJ's finding that [plaintiff] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence and explained his conclusion in a lengthy, detailed decision. That determination is supported by substantial evidence in the record. Plaintiff's Motion to Reverse the Decision of the Commissioner should therefore be denied.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #15] is DENIED, that Defendant's Dispositive Brief [Doc. #17] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 10th day of April, 2025.

Joi Elizabeth Peake
United States Magistrate Judge

15